UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MYRIAM MARINO,<br>        *Plaintiff*,<br>        *v.*<br>EGS ELECTRICAL GROUP, LLC and<br>OZ GEDNEY COMPANY, LLC,<br>        *Defendants*. | Civil No. 3:12cv518 (JBA)<br><br><br>March 31, 2014 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendants EGS Electrical Group, LLC and OZ Gedney Company, LLC[1] (collectively "EGS") move [Doc. # 35] for summary judgment ON Plaintiff Myriam Marino's Amended Complaint [Doc. # 18] claiming race, national origin, and gender-based termination and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., (Count One), 42 U.S.C. § 1981 (Count Two), and the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-58, *et seq*,, (Count Three); retaliation in violation of Title VII and the CFEPA (Count Four); and negligent retention and supervision (Count Five).  For the reasons that follow Defendants' motion is granted in part and denied in part.

**I.      Factual Background**

Plaintiff is a Puerto Rican woman who was hired in December 2007 as a kits assembler at Defendants' East Granby, Connecticut manufacturing plant.  (*See* Pathak Aff., Ex. A to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 38] ¶ 2.)  Plaintiff was supervised by the plant's Facilities Manager, Douglas Johnson, who reported to Shiram Pathak, the Operations Manager.  (*See* Johnson Dep. Tr., Ex. 4 to Defs.' 56(a)1 Stmt. at 36.)  Donald Young, the Vice President of Human Resources, provided oversight of personnel matters

---

[1] Neither party addresses the relationship between the two corporate Defendants.

from Defendants' headquarters in Colorado.  (*See* Young Dep. Tr., Ex. 5 to Defs.' 56(a)1 Stmt. at 9–10.)

On June 17, 2010, Marino first reported to Pathak that she was having difficulties with Jessica Smyth, a white braider operator at the plant.  Marino reported that over the past few weeks Smyth had started to make "gestures specifically laughing at her, showing thumbs up at her without reason, etc.," which made "her very uncomfortable" and it seemed that Smyth was "trying to intimidate her."  (Email Pathak to Young, June 17, 2010, Ex. 10 Pl.'s Loc. R. 56(a)2 Stmt. [Doc. # 41-1] at 1.)

In early 2011, when Marino moved from the second to first shift, she had increased interactions and difficulties with Smyth.  (*See* Marino Dep. Tr., Ex. 1 to Defs.' 56(a)1 Stmt. at 57, 64.)  Plaintiff's work area was centrally located in this small plant such that other employees would have to pass by her to get to the restrooms and other areas of the plant.  While passing by Marino's work area, Smyth regularly engaged in bizarre, intimidating, and threatening behavior directed at Marino, such as smacking her fist with her hand, banging a water bottle against her hand, throwing a napkin towards her, pushing spools against her work area, and smirking and staring at her.  (*Id.* at 111–14, 121–122; Johnson Dep. Tr. at 29.)

Marino repeatedly complained to management about Smyth's harassment, with no resulting action taken.  Although Marino did not recall the specific dates of each of her complaints, from early 2011 through June 2011, she at least spoke twice with Johnson and once with Pathak about these incidents, telling them that she was afraid that Smyth would try to harm her.  (Marino Dep. Tr. at 123, 146.)  On February 23, 2011, Marino told Pathak that Smyth "gestures at her in a way that [suggests] she is going 'to get' her." (Email Pathak to Young, Feb. 23, 2011, Ex. 9 to Pl.'s 56(a)2 Stmt. at 2.)

Johnson initially directed Marino to ignore Smyth and said that he would discuss the issue with Pathak.  (Marino Dep. Tr. at 110, 115.)  When Marino complained to Johnson in early 2011, Smyth's behavior got progressively worse and the incidents increased in frequency.  (*Id.* at 132.)  After Marino made several additional complaints, Johnson and Pathak met with her and told her that EGS would investigate her complaints and that she should continue to ignore Smyth.  (*Id.* at 144, 146; Pathak Dep. Tr. at 63.) Johnson, Pathak, and Young had several discussions with Smyth in which they warned her that "her behavior was disruptive and would not be tolerated."  (Pathak Dep. Tr. at 71; *see also* Johnson Dep. Tr. at 34; Young Dep. Tr. at 42.)

Nancy Adorno, a coworker at the plant, told Marino that a temporary worker had told Adorno that Smyth referred to Marino as a "f**king Puerto Rican bitch," and said, "I hate her and I want to whoop her ass."  (Marino Dep. Tr. at 108.)  Another coworker, Arthur Shelly, told Marino that he heard Smyth make a nearly identical comment about Plaintiff.  (*Id.* at 136–137.)  Marino believed that she reported the first incident to Johnson, but did not report the second incident to anyone because no corrective action was being taken.  (*Id.* at 109, 137.)  Johnson denies that Plaintiff ever made such a report. (Johnson Dep. Tr. at 30.)  On one occasion, Plaintiff heard Smyth say to Roy McCarter, an African-American male, "you are nothing but a motherf**king n*gger and . . . I'm going to f**k you up."  (Marino Dep. Tr. at 103.)  Several other employees—including Leonard DeGray, a white male, and McCarter—made similar complaints to management regarding Smyth.  (Marino Dep. Tr. at 104, 140; Pathak Dep. Tr. at 37.)

After Smyth's conduct continued unabated, on March 4, 2011, Pathak and Johnson convened a meeting with Plaintiff, Smyth, DeGray, and McCarter in which they warned all four of them to discontinue their "childish behavior" or else they would be in

danger of losing their jobs.  (Marino Dep. Tr. at 148; Pathak Dep. Ex. 9.)  After this meeting, Smyth complained to management that Marino and her other coworkers had started to ostracize her and would not talk to her.  (Pathak Dep. Tr. at 38; Johnson Dep. Tr. at 41.)

Smyth's "intimidating and harassing" behavior towards Marino continued even after this meeting and on June 23, 2011, Plaintiff complained to her supervisor Michael Farslow, and later that day called EGS's compliance hotline to report that Smyth had "been harassing" her and would go into her work area and make "bullying, intimidating, and threatening gestures."  (Marino's Ethics Employee Hotline Report, Ex. 11 to Pl.'s 56(a)2 Stmt.)  Marino stated that since she had first complained about Smyth, it appeared that Smyth had "even more of vendetta" against her.  (*Id.*)

In a June 28, 2011 email to Pathak (Ex. 13 to Defs.' 56(a)2 Stmt.), Johnson wrote that he had met with Smyth earlier that day and explained to her that she needed to stop "the giggling, laughing and clapping," because of "its effect on her fellow employees and she was to act more professional."  On July 20, 2011, Pathak, Johnson, and Young held another meeting with Marino, Smyth, DeGray, and McCarter in which Young again warned them that they had to immediately commit to ending "the disruptive behavior" or else they would be terminated.  (Young Dep. at 76; Johnson Dep. at 58.)  All four verbally acknowledged their agreement.  (Young Dep. at 78.)  Young told them that they would each receive letters summarizing this meeting in which they would have to confirm their commitment to ceasing their disruptive behavior and warned them that if they did not sign the letters they would be terminated.  (*Id.* at 79.)

A letter dated July 21, 2011 (Ex. 16 to Pl.'s 56(a)2 Stmt.) addressed to Plaintiff from Pathak summarized the meeting the prior day, stating that the meeting was called

"to address the ongoing behavioral problems involving you and three other employees." The letter stated that Young had "explained that the reported behavior was unacceptable in the work environment and needed to be corrected immediately . . . . Each employee had a choice to either agree to this commitment or to end their employment effective immediately." (*Id.*)   Marino considered whether to sign the letter and decided not to because she had done nothing wrong.   (Marino Dep. Tr. at 170; Pathak Dep. Tr. at 90.) She was terminated for her refusal to sign.  (Marino Dep. Tr. at 172.)  Smyth, DeGray, and McCarter each signed their letters but wrote on their respective letters that they disagreed that they had done anything wrong.  As a result, they were not discharged or further disciplined at that time.  (Pathak Aff. ¶¶ 3–7 & Exs. A–C.)

II.    **Discussion**[2]

A.    **Race and National Origin Discrimination Claims (Counts One Through Three)**[3]

Plaintiff claims that her termination was the result of Defendants' discrimination on the basis of her race and national origin.  To meet the minimal burden of establishing a prima facie case of discrimination in the termination context, "a plaintiff must show that he (1) is a member of a protected class; (2) was performing his duties satisfactorily; (3) was discharged; and that (4) his discharge occurred under circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class."[4]

---

[2] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted).  "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When considering a motion for summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record.  Fed. R. Civ. P. 56(c).

[3] Plaintiff did not oppose summary judgment on her gender discrimination claims in Counts One through Three, and the Court considers them abandoned.  *See Taylor v. City of New York,* 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

[4] "Although *McDonnell Douglas* concerned the burden and allocation of proof under Title VII, its framework is also applied to claims under 42 U.S.C. § 1981, and the CFEPA." *Chukwurah v. Stop & Shop Supermarket Co. LLC*, 354 F. App'x 492, 494 n.1 (2d Cir. 2009) (internal citations omitted).

*Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  If shown, "the burden shifts to the employer to articulate a legitimate, non–discriminatory reason for the employee's dismissal.  If such a reason is proffered, the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action."  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  The separate stages of a plaintiff's demonstration of a prima facie inference of discrimination and pretext "tend to collapse as a practical matter under the *McDonnell Douglas* framework."  *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 n.1 (2d Cir. 2002).

Defendants do not dispute that Plaintiff has satisfied the first three prongs of her prima facie case, but argue that she has proffered no admissible evidence to support an inference that her termination was the result of discrimination.  (*See* Defs.' Mem. Supp. [Doc. # 35-1] at 16–17.)  Defendants contend that DeGray and McCarter made complaints about Smyth that were "essentially identical" to those made by Plaintiff, and Smyth "similarly made complaints about their conduct."  In the face of many complaints, Defendants contend that all of the employees were treated the same, receiving the same admonishments to discontinue their behavior.  (*Id.* at 22.)  Defendants argue that Plaintiff by her own admission had no reason to believe she was terminated on the basis of her race or national origin, and her only basis for claiming discrimination was repeated comments by Smyth about her Hispanic ancestry.  (*Id.* at 20.)

At oral argument, Plaintiff's counsel clarified that the basis for her discrimination claim is that because Defendants failed to investigate her complaints and to discipline Smyth, they knowingly allowed her to be subjected to continuing discriminatory treatment and harassment, which ultimately resulted in her termination.  She further

7

contends that Defendants took more seriously the complaints about Smyth lodged by DeGray, a white male.

Defendants contend unpersuasively that Plaintiff has not demonstrated any inference of discrimination because she did not directly hear Smyth's disparagement of her.  They contend that Smyth's remarks are inadmissible hearsay and that even if they were admissible, these remarks were not connected to Marino's ultimate termination. While Under Fed. R. Civ. P. 56(c)(1)(b), "the district court in awarding summary judgment, may rely only on admissible evidence," *Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) (internal quotation marks omitted), Plaintiff's testimony that she reported to Young one of the discriminatory incidents she learned from a co-worker is admissible to show that Young was on notice that Smyth was subjecting Plaintiff to discriminatory treatment on the basis of her race and national origin.  *See McArdle v. Arms Acres, Inc.*, No. 03cv05721 (PGG), 2009 WL 755287, at *7 n.4 (S.D.N.Y. Mar. 23, 2009) ("Mugavero's testimony about the complaints she made to Hesse are not hearsay, however, because they are offered to demonstrate that Hesse and Arms Acres were on notice of these incidents, not to establish that they actually occurred.").  Plaintiff's use of the statements for this purpose is consistent with her theory of liability that management allowed the discrimination against her to continue unabated with knowledge of what was occurring, and could support an inference of discriminatory failure to intervene or protect.

Defendants proffer that Marino's refusal to sign the July 21, 2011 letter as their legitimate non-discriminatory reason for her termination.  It is undisputed that Plaintiff and other employees had ongoing disputes with Smyth, and they all filed multiple complaints with their supervisors which did not result in the resolution of their conflicts. Without investigating any of these conflicts, Defendants' response was to tell Marino to

ignore Smyth's conduct, and later to stop their "childish behavior" and to commit "that the behavior in question would end immediately . . . or to end their employment effective immediately." (July 21, 2011 Ltr. Pathak to Marino.) However inadequate or unfair Defendants' responses to these incidents may have been, Plaintiff's refusal to sign this agreement was a legitimate nondiscriminatory employment action. *See Lytle v. JPMorgan Chase*, No. 08cv9503 (DAB) (JLC), 2012 WL 393008, at *22 (S.D.N.Y. Feb. 8, 2012) ("Even when reviewing the facts in the light most favorable to Lytle, his failure—indeed his refusal—to comply with a requirement of his employment [affirming the company code of conduct,] was a legitimate, nondiscriminatory reason for his termination as a matter of law.").

Therefore, it becomes Plaintiff's burden to show facts from which a reasonable jury could conclude that this explanation is pretext for discrimination. "[Proving pretext] requires the plaintiff to produce 'not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the [defendant] were false, and that more likely than not discrimination was the real reason for the [adverse action]." *Underdog Trucking, L.L.C. v. Cellco P'ship*, 514 F. App'x 31, 33 (2d Cir. 2013) (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)) (alterations in original)). "The ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.' In other words, '[i]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146-47

(2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 519 (1993) (internal citations omitted) (alterations in original)).

Plaintiff contends that the record contains sufficient evidence for "a reasonable fact-finder [to] easily reach the conclusion that the Caucasian perpetrator was being protected while the real message to Plaintiff and others was 'no more complaints of harassment and hostile working conditions.[']" (Pl.'s Opp'n [Doc. # 41] at 14.) However deficient the quality of Defendants' response to employee complaints about Smyth's conduct, which lumped all accusers and counter-accusers into the same category without an effort to ascertain the validity of any employee's complaint, is not sufficient on its own to demonstrate that Defendants' explanation was a pretext for Plaintiff's discriminatory discharge. *See Rodriguez v. City of New York*, 644 F. Supp. 2d 168, 187 (E.D.N.Y. 2008) ("[T]he fact that an employee disagrees with the results of an employer's decision regarding termination, or even has evidence that the decision was objectively incorrect or was based on a faulty investigation, does not automatically demonstrate, by itself, that the employer's proffered reasons are a pretext for [discrimination].").

Plaintiff's further contention that Defendants conducted a more thorough investigation of DeGray's complaints than hers is not consistent with the evidence, however. Although Young spoke with DeGray after his February 17, 2011 call to the ethics hotline regarding Smyth (Young Dep. Tr. at 37), but did not similarly respond to Marino's ethics hotline complaint, both contended that Defendants failed to investigate their complaints. In DeGray's first call to the hotline in June 2010, he stated that over the past year Smyth had been displaying "strange and bizarre behavior" and that he had complained to Farslow and Pathak in May 2010 and did "not understand why no one had addressed this issue." (DeGray's Ethics Employee Hotline Report, Ex. 12 to Defs.' 56(a)1

10

Stmt.)   Likewise, in his affidavit, DeGray stated that he made multiple complaints to Farslow and Young about his concerns, "but nothing improved." (DeGray Aff., Ex. 20 to Pl.'s 56(a)2 Stmt. ¶¶ 10–11.)   Additionally, EGS was not totally unresponsive to Plaintiff's complaints. At some point in early 2011, Johnson and Pathak met with Plaintiff and told her they would investigate her complaints. Although no one contacted Plaintiff after her June 23, 2011 call to the ethics hotline, Young and Pathak did discuss her call, resulting in the July 20, 2011 meeting, albeit nearly a month after Plaintiff's hotline complaint.

In the absence of sufficient evidence to support an inference that Defendants' termination of Plaintiff was motivated by discriminatory animus, summary judgment is granted to Defendants on the discriminatory termination claims in Counts One through Three.

### B.    Hostile Work Environment (Counts One through Three)

Although not explicitly pleaded in the Amended Complaint, Plaintiff refers to "complaints of hostile work environment" in Counts One through Three, and has advanced a hostile work environment claim in her opposition to summary judgment. Title VII is violated when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), as is § 1981, *see Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 226 (2d Cir. 2004) (recognizing § 1981 hostile work environment claims against individual defendants where certain discriminatory acts based solely on race give rise to a hostile work environment claim).  To survive a motion for summary judgment, Plaintiff must provide evidence from which reasonable jurors could conclude:

> (1) that the workplace was permeated with discriminatory intimidation
> that was sufficiently severe or pervasive to alter the conditions of her work

environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.

*Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003) (citation omitted).  The test for a hostile work environment is both subjective and objective, considering the totality of the circumstances.  *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir 2003).

Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.*  For conduct to be frequent, "[a]s a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Terry*, 336 F.3d at 143 (internal quotations and citations omitted).

"Although actionable harassment is not confined to explicitly racial conduct, 'the plaintiff is required to establish that the harassment complained of was based on her [race]'"  *James v. Conn. Dep't of Corr.*, 3:05cv1787 (CFD), 2009 WL 279032, at *6 (D. Conn. Jan. 14, 2009) (quoting *Galdieri–Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir. 1998) (alterations in original)).  However, even without direct evidence of racially overt acts, a hostile work environment claim could withstand summary judgment with circumstantial evidence, particularly where egregious.  *See Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (courts "recognize that most discrimination . . . is not carried out so openly as to provide direct proof of it. Accordingly, an aggrieved party may use circumstantial evidence to assert a prima facie case of discrimination."); *see also Lewis v. State of Conn. Dep't of Corr.*, 355 F. Supp. 2d 607, 622–23 (D. Conn. 2005) (Kravitz, J.) (Though "neither incident involved a comparably overt, egregious, and clear act of racial discrimination (such as a barrage of

12

racial slurs) . . . . The Court believes a reasonable trier of fact considering the totality of circumstances, could conclude that these [six] incidents, occurring over a relatively short period of time, 'were sufficiently continuous and concerted' to have altered the conditions of her working conditions as to constitute a hostile environment.").

Additionally, "when the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence" under Title VII, *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 63 (2d Cir. 1998) (alterations in original)), and a plaintiff "must demonstrate that her employer 'failed to provide a reasonable avenue for complaint' or that 'it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action.'" *Id.* (quoting *Howley v. Town of Stratford,* 217 F.3d 141, 154 (2d Cir. 2000)).   Whether a "company's response was reasonable has to be assessed from the totality of the circumstances. Factors to be considered in this analysis are the gravity of the harm being inflicted upon the plaintiff, the nature of the employer's response in light of the employer's resources, and the nature of the work environment."  *Id.* at 766 (quoting *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 65 (2d Cir. 1998)).  "If the evidence creates an issue of fact as to whether an employer's action is effectively remedial and *prompt,* summary judgment is inappropriate." *Id.* (quoting *Gallagher v. Delaney,* 139 F.3d 338, 348 (2d Cir. 1998)).

There is ample evidence that Marino and other employees faced repeated incidents of harassment and threats by Smyth for over a year.  There were numerous complaints made to EGS by Marino and other co-workers regarding this conduct, and although EGS management spoke with Marino and Smyth regarding these complaints, there is no evidence that they took meaningful action to effectively address the situation

since their response was limited to telling Marino to just ignore Smyth's harassing conduct.   Accordingly, for its analysis the Court will assume that Plaintiff has demonstrated that there was severe and pervasive harassment by a co-worker and that there is a sufficient basis to for imputing that conduct to Defendants for their failure to provide an avenue for redress and for failure to take appropriate action.

Defendants assert that Plaintiff has not demonstrated a "connection between [Smyth's] alleged conduct and Plaintiff's protected characteristics." (Defs.' Mem. Supp. at 27.)  The evidence to support Plaintiff's claim that Smyth's harassment was motivated by racial discrimination consists of Plaintiff's contention that she heard that Smyth had made overtly racially disparaging comments about her on two occasions and Plaintiff's witnessing of Smyth making such a comment to McCarter.

Defendants contend that Smyth's comments about Marino are insufficient to demonstrate that Smyth was motivated by discriminatory animus, because "those comments were stray remarks made outside her presence" and are inadmissible hearsay. (Defs.' Mem. Supp. at 27.)  The fact that Smyth's remarks were made outside Marino's presence does not make them any less intimidating or severe, particularly given the hateful content of the remarks of her co-worker, which clearly can alter an employee's working conditions and contribute to a hostile work environment.  *See Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) ("[T]he fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor also can impact the work environment.").

However, the Court can consider only material that is "presented in a form that would be admissible in evidence" at trial.  Fed. R. Civ. P. 56(c)(1)(b).  Whether or not a given statement is inadmissible hearsay depends upon the purpose for which it is offered.

14

*See United States v. Detrich*, 865 F.2d 17, 20 (2d Cir. 1988) ("No statement is inherently hearsay. Whether or not a statement is hearsay depends upon what use the offeror intends the fact-finder to make of it.").  Although Plaintiff does not address this issue, the statements of Adorno and Shelly recounting Smyth's comments may have relevance for two purposes here: (1) the truth of the matter asserted—that Smyth actually called Marino a "Puerto Rican b*tch," which evidences her discriminatory animus and (2) that Marino believed that Smyth made such comments, contributing to Marino's perception of a hostile work environment, whether true or not.

To the extent that these statements are offered as circumstantial evidence of Marino's state of mind—that she believed that Smyth had made such comments about her—they are not hearsay and are admissible.  However, Marino cannot testify that Smyth actually made such comments, because she did not personally observe the comments being made and only learned of them second-hand form Adorno and Shelly. *See Bailey v. USF Holland, Inc.*, 444 F. Supp. 2d 831, 850 (M.D. Tenn. 2006) (employee's testimony that he learned second hand that another person had used a racial slur was hearsay and "cannot be asserted for the truth of the allegations" that the slur was used, but it was "admissible inasmuch as it demonstrates [the employee's] belief that the term . . . was used").

No affidavit is offered from Adorno and Shelly's affidavit does not recount Smyth making any derogatory racial comments or threatening language about Marino, although he describes a different "well-known incident" in which Smyth "threatened to kill or do harm to an African-American employee," who was still employed at EGS after Plaintiff's termination.  (Shelly Aff. ¶ 8.)  Thus, Marino's accounts of what others told her that

15

Smyth said about her are inadmissible hearsay if offered to prove that Smyth actually made such discriminatory statements.

The racially charged statements Marino heard Smyth make to McCarter provide other evidence of some of the workplace contamination caused by Smyth's discriminatory animus.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ("Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.  Nor must offensive remarks or behavior be directed at individuals who are members of the plaintiff's own protected class.  Remarks targeting members of other minorities, for example, may contribute to the overall hostility of the working environment for a minority employee." (internal citation omitted)).

Importantly, DeGray stated that while Smyth "often taunted and used frightening and threatening gestures against me and other employees," she "taunted and harassed the Spanish speaking women that worked at EGS the most; and especially Myriam Marino." (DeGray Aff. ¶ 8.)  Shelly stated that on "several occasions" he witnessed Smyth "stand across from Myriam's work station while Myriam was working for a period of 15 minutes or more, slapping her own ass while staring at Myriam."  (Shelly Aff. ¶ 4.)  Shelly stated that Smyth "targeted other employees, including me, but she seemed to have a special attitude and hatred toward Myriam."  (*Id.* ¶ 4.)  Although Smyth also targeted DeGray, a white male, as well has her nonwhite coworkers, there is at least a reasonably sufficient inference that can be drawn that she was particularly hateful to African Americans and Hispanics, and particularly to Marino.

Contrary to Defendants' assertion that Smyth's racist remarks were simply "stray remarks" (Defs.' Mem. Supp. at 27), the record shows that Marino suffered from severe and pervasive harassment from Smyth for over a year.  She need not demonstrate that in each of these incidents of harassment Smyth made it explicit that the harassment was on the basis of Marino's race or national origin, because from Smyth's racist comments, a reasonable jury could infer that Smyth's pattern of behavior, which included targeting Marino was motivated by discriminatory animus.  For example in *Howley*, 217 F.3d at 149, the plaintiff presented evidence of one incident in which her co-worker used gender-based obscenities against her and other incidents of harassment thereafter "albeit taking forms other than obscene verbal assault."  The Second Circuit rejected the argument that these subsequent incidents of harassment were not relevant to a gender-based hostile work environment claim, because "[g]iven the contents of [the first] barrage, a factfinder would be entitled to infer that any harassment . . . thereafter, with or without obscenities, was gender-based."  *Id.* at 156.

Accordingly, summary judgment is denied to Defendants on the hostile work environment claims in Counts One through Three.

### C.      Retaliation (Count Four)

The burden-shifting framework laid out in *McDonnell Douglas* also governs Plaintiff's retaliation claim.  *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013).  "To make out a prima facie case of retaliation, a plaintiff must make four showings: that '(1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity.'"  *Id.* (quoting *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006)).  "Once a prima facie case of

retaliation is established, the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action." *Id.* (quoting *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir. 2001)).  "If the employer demonstrates a legitimate, non-discriminatory reason, then the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Summa*, 708 F.3d at 125.

Further, "a plaintiff alleging retaliation in violation of Title VII must show that retaliation was a 'but-for' cause of the adverse action, and not simply a 'substantial' or 'motivating' factor in the employer's decision.  However, 'but-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845–46 (2d Cir. 2013) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526, 2533 (2013)).[5]

An internal complaint to an employer is a protected activity under Title VII.  *See La Grande v. DeCrescente Distrib. Co., Inc.*, 370 F. App'x 206, 212 (2d Cir. 2010) ("The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including complaints to management.").

---

[5] Although the Connecticut Supreme Court has not yet addressed whether the *Nassar* formulation of causation applies under the CFEPA, *see Consiglio v. Cigarette*, CV126027652S, 2014 WL 783471 (Conn. Super. Ct. Jan. 27, 2014), ("[O]ur Supreme Court has not yet adopted *Nassar's* narrow definition of the word 'because' and applied it to a claim brought under § 31–290a"), the Second Circuit has suggested that *Nassar* does not alter the district court's analysis in a summary judgment proceeding, *see Zann Kwan*, 737 F.3d at 846 ("The determination of whether retaliation was a 'but-for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.").

To establish the first element of the prima facie retaliation claim, a plaintiff need only prove that his or her complaint "was motivated by a good faith, reasonable belief that the underlying employment practice was unlawful," not that the underlying complaint of discrimination had merit. *Rivera v. Rochester Genesee Regional Transp. Authority,* 702 F.3d 685, 698 (2d Cir. 2012) (internal quotation marks omitted). Mere subjective good faith belief is insufficient; the belief must be reasonable and characterized by objective good faith. *Id.* at 16; *see also Manoharan v. Columbia University College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988). The objective reasonableness of a complaint is to be evaluated from the perspective of a reasonable similarly situated person in light of the totality of the circumstances. *Kelly,* 716 F.3d at 14, 17. As discussed above, that Marino personally experienced some threatening and on-going behavior from Smyth with knowledge that Smyth's hostility was related to her being Puerto Rican and Smyth's broad racial animus, having witnessed Smyth's racism is sufficient to establish that Marino had a good faith reasonable belief that she was opposing an unlawful racially hostile workplace.

"As to the second element [of the prima facie case], implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Id.* at 15 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 291 (2d Cir. 1998) (alterations in original)). "[F]or purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case." *Zann Kwan*, 737 F.3d at 844 (quoting *Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir. 2000)).

Defendants contend that Plaintiff has failed to establish this second element because EGS "did not and should not have reasonably understood Plaintiff's complaints to be allegations of unlawful discrimination." (Defs.' Mem. Supp. at 29.)  However, it is undisputed that Marino made multiple complaints to her supervisors about Smyth's behavior towards her, and it remains in dispute whether she reported Smyth's racial animus to Johnson and whether he should have understood her to be complaining of Smyth's racially motivated conduct towards her.  Marino was not required to use any particular "magic words . . . when complaining" as long as she "put the employer on notice that [she] believe[d] that discrimination [was] occurring." *Ramos v. City of New York*, No 96cv3787 (DLC), 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997).  Marino's complaint regarding the racist comments and subsequent complaints by her and her coworkers of ongoing harassment and intimidation by Smyth is at least minimally sufficient to put Defendants on notice that Marino was attempting to engage in protected activity even if each complaint did not explicitly refer to Marino's belief that Smyth was motivated by discriminatory animus.  *See Howley*, 217 F.3d at 149.

The third element is satisfied, as Plaintiff's termination is indisputably an adverse employment action.  On the final element of the prima facie case, while "temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, . . . without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

Plaintiff alleges that her termination was retaliation for her complaints about Smyth.  (*See* Am. Compl. Count Four, ¶ 23.)  Plaintiff's termination less than one month after her June 23, 2011 call to the ethics hotline is sufficient to establish causation based

on temporal proximity.  *See Summa*, 708 F.3d at 128 ("There is strong reason to find this four-month time span sufficient in this case to establish causation . . . .").  As discussed above, Defendants' proffered justification for Plaintiff's termination was her refusal to sign the letter although Plaintiff had previously affirmed that she would not engage in disruptive behavior.  Plaintiff contends that "[t]his is merely pretext for Defendants['] motivation for ceasing . . . the reporting of all complaints involving Ms. Marino and Smyth . . . and making clear that reports of harassment would not be tolerated," (Pl.'s Opp'n at 17), i.e., that Marino was terminated to stop her protected activity of complaining about her perception of unlawful workplace harassment.

There is no evidence in the record that Marino had engaged in any "childish" or "disruptive" behavior or misconduct of any kind, notwithstanding Defendants reference in the letter to "unacceptable" behavior that "needed to be corrected immediately," because Young and Johnson had "been repeatedly pulled away from [their] production responsibilities to address these behavioral problems."   (July 21, 2011 Ltr. Pathak to Marino.)

A jury could reasonably draw the inference that as to Marino the "behavior in question" that needed to end immediately was the filing of complaints about Smyth's ongoing threatening behavior towards her, which she believed was racially motivated. The reference to interference with Young and Johnson's production responsibilities to address complaints could be inferred to mean that Defendants were not interested in responding to or listening to further complaints regardless of the merits of those complaints and intended to do nothing to evaluate culpability, having branded all equally as having engaged in "behavioral problems."

Although the July 21, 2011 letter to Marino does not expressly reference her prior complaints, a reasonable jury could infer that it referred to her repeated complaints, which Defendants deemed disruptive and unacceptable, and despite having conducted no investigation, Defendants' purpose could be seen as retaliatory where Defendants simply resorted to painting the minority victim with the same brush as her white harasser. Accordingly, Defendants' motion for summary judgment on Count Four is denied.

### D.     Negligent Supervision (Count Five)

Plaintiff's final claim that Defendants' "failure to question or investigate the illegal conduct of Ms. Smyth constitutes negligent retention and supervision," which resulted in emotional distress for Plaintiff, (*see* Am. Compl. Count V, ¶ 28; Pl. Op. at 18), is not a cognizable claim.  Under Connecticut law, an employee cannot bring a claim against her employer for employee conduct resulting in emotional distress occurring during an on-going employment relationship, as distinguished from conduct occurring in the termination of employment or a claim of negligent supervision or retention asserted by a non-employee third-party.  *See Perodeau v. City of Hartford*, 259 Conn. 729, 757 (2002); *Dinice-Allen v. Yale-New Haven Hosp.*, No. 3:06CV00675 (PCD), 2008 WL 160206, at *7 (D. Conn. Jan. 10, 2008) ("Negligent conduct within the employment context does not create liability for emotional distress."); *McKinney v. Dep't of Transp For Conn.*, No. 3:06-CV-2055 (WWE), 2010 WL 1883427, at *5 (D. Conn. May 11, 2010) (holding that Connecticut does not recognize "claim of negligent supervision relate[d] to negligent conduct in the course of plaintiff's employment.").  Given that Plaintiff alleges emotional distress that Defendants negligently permitted to be inflicted upon her during the course of her employment, Plaintiff has not stated a claim for relief.  Accordingly, summary judgment is granted to Defendants on Count Five.

**III.     Conclusion**

For the reasons discussed above, Defendant's motion [Doc. # 35] for summary judgment is GRANTED as to the discriminatory termination claims in Counts One through Three and as to Count Five in its entirety; and is DENIED as to hostile work environment claims in Counts One through Three, and Court Four in its entirety.


IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 31st day of March, 2014.